## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

United States of America,

              Plaintiff,

v.

Jermaine Dushun Travis,

              Defendant.

**Criminal No. 14-253 (DSD/SER)**


**REPORT AND
RECOMMENDATION**

---

Thomas Calhoun-Lopez, Esq., United States Attorney's Office, 300 South Fourth Street, Suite 600, Minneapolis, Minnesota 55415, for Plaintiff.

Michael C. Hager, Esq., Hager Law Office, 310 4th Avenue South, Suite 1150, Minneapolis, Minnesota 55415, for Defendant.

---

STEVEN E. RAU, United States Magistrate Judge

The above-captioned case came before the undersigned on Defendant Jermaine Dushun Travis's ("Travis") six motions to suppress.[1] This matter was referred for the resolution of the issues raised in Travis's Motions to Suppress pursuant to 28 U.S.C. § 636(b)(1)(B)–(C) and District of Minnesota Local Rule 72.1. For the reasons stated below, the Court recommends that the Motions to Suppress Physical Evidence be denied, the Motions to Suppress Statements be

---

[1] Specifically, the six motions to suppress addressed in this Report and Recommendation are: Motion to Suppress Evidence Obtained by Seizure ("Motion to Suppress Evidence from Travis's Cell") [Doc. No. 20]; Motion to Suppress Evidence Obtained by Search and Seizure [Doc. No. 22]; Motion to Suppress Statements [Doc. No. 23]; Motion for Suppression of Electronic Surveillance Wiretapping Evidence ("Motion to Suppress Wiretapping Evidence") [Doc. No. 24]; Motion to Suppress Physical Evidence [Doc. No. 37]; and Motion to Suppress Statements, Admissions and Answers Made by the Defendant to Law Enforcement Officers that the Government Intends to Use at Trial [Doc. No. 38]. The Court refers collectively to Document Numbers 22 and 37 as the "Motions to Suppress Physical Evidence" because they seek the same relief, and refers to Document Numbers 23 and 38 collectively as the "Motions to Suppress Statements" because they seek the same relief. The Court refers collectively to all of these motions as the "Motions to Suppress."

granted in part and denied in part, and the Motion to Suppress Evidence from Cell and Motion to Suppress Wiretapping Evidence be denied as moot.

## I.      BACKGROUND

On August 5, 2014, the United States of America (the "Government") filed an indictment charging Travis with one count of felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2), one count of possession with intent to distribute heroin in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C), and one count of use of a firearm during and in relation to a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1)(A). (Indictment) [Doc. No. 1].

The Court held an evidentiary hearing on October 30, 2014. (Minute Entry Dated Oct. 30, 2014) [Doc. No. 43]. Bloomington Police Department Officer Ryan Arbuckle ("Officer Arbuckle") and Bloomington Police Department Detective Nick Melser ("Detective Melser") testified. (Ex. & Witness List) [Doc. No. 44]. Three exhibits were received into evidence: Government's Exhibit 1, a copy of the video from Officer Arbuckle's squad car; Government's Exhibit 2, a copy of a recording made of the conversation between Travis and Detective Melser on June 5, 2014; and Government's Exhibit 3, a copy of the search warrant executed at the Comfort Inn in Bloomington, Minnesota (the "Search Warrant").[2] (*Id.*). Supplemental briefing was submitted after the hearing. (Suppl. Mem. in Supp. of Mots. to Suppress Evidence, "Travis's Suppl. Mem.") [Doc. No. 50];[3] (Gov't's Resp. to Travis's Suppl. Mem., "Gov't's Suppl. Mem.") [Doc. No. 52]; *see* (Minute Entry Dated Oct. 30, 2014 at 2). Travis requested permission to file a

---

[2]      A copy of the Search Warrant was also submitted with the Government's initial response to Travis's Motions to Suppress. (Search Warrant, Attached to Gov't's Omnibus Resp. to Def.'s Pretrial Mots., "Gov't's Omnibus Resp.") [Doc. No. 42].
[3]      Travis submitted two supplemental memoranda on the same day; the Court only considers the second memoranda, which appears to be a corrected version of the first.

reply memorandum of law, which the Court granted. (Text Only Order Dated Dec. 18, 2014) [Doc. No. 55]. The Motions to Suppress were taken under advisement on December 23, 2014, when Travis's reply was filed. (Reply Mem. in Supp. of Mots. to Suppress Evidence, "Reply") [Doc. No. 56].

The case is currently set for trial before the Honorable David S. Doty on January 26, 2015. (Minute Entry Dated Oct. 30, 2014 at 2).

## II.    FACTS

Officer Arbuckle pulled Travis over for several traffic violations on June 4, 2014, in Bloomington, Minnesota. (Tr. of Mots. Hr'g Held on Oct. 30, 2014, "Tr.") [Doc. No. 47 at 5–10]. Officer Arbuckle first noticed Travis's vehicle when Officer Arbuckle was traveling north on Bloomington Avenue, and Travis was traveling south on the same street. (*Id.* at 6). Officer Arbuckle observed that the windows in Travis's vehicle had "extremely dark tint." (*Id.*). Based on Officer Arbuckle's training, he believed that the windows did not permit fifty percent of light in violation of state law.[4] (*Id.* at 6–7). Also, Officer Arbuckle observed an obstruction that appeared to be flowers hanging from the review mirror. (*Id.* at 8). The obstruction obscured the driver's vision of the windshield in violation of state law.[5] (*Id.*). With the intent of pulling Travis over for the traffic violations, Officer Arbuckle checked the license plate and executed a U-turn so that his vehicle was behind Travis's vehicle. (*Id.* at 8–9). After the U-turn, Officer Arbuckle's vehicle was behind Travis's southbound vehicle on Bloomington Avenue, approaching the

---

[4]    *See* Minn. Stat. § 169.71, subdiv. 4(a)(3) ("No person shall drive or operate any motor vehicle required to be registered in the state of Minnesota . . . when any side window or rear window is composed of or treated with any material so as to obstruct or substantially reduce the driver's clear view through the window or has a light transmittance of less than 50 percent plus or minus three percent in the visible light range or a luminous reflectance of more than 20 percent plus or minus three percent[.]").

[5]    *See* Minn. Stat. § 169.71, subdiv. 1(a)(2) ("A person shall not drive or operate any motor vehicle with . . . any objects suspended between the driver and the windshield . . . .").

3

intersection with American Boulevard. (*Id.* at 9). At the stop sign, Officer Arbuckle observed Travis's right-turn signal activate too late—in other words, not sufficiently in advance of the turn—in violation of state law, and Travis's vehicle turned right onto American Boulevard.[6] (*Id.* at 9–10). Officer Arbuckle followed the vehicle, and initiated a traffic stop when, a few blocks later, the vehicle turned right into the parking lot of the Comfort Inn.[7] (*Id.* at 10). Officer Arbuckle turned on his emergency lights as he followed the vehicle into the parking lot, which activated his car's recording devices. (*Id.* at 10). The camera began recording thirty seconds before the emergency lights were activated, and the microphone began recording at the time the emergency lights were activated. (*Id.* at 10–11, 14); (Gov't's Ex. 1 at 1:04:49–1:05:30).

When Officer Arbuckle approached the vehicle, the driver, later identified as Travis, rolled down the window. (Tr. at 12–13). Based on his training and experience, Officer Arbuckle detected "the strong odor of burnt marijuana" emanating from the vehicle. (*Id.* at 13, 53); *see also* (*id.* at 15). Per standard protocol, Officer Arbuckle radioed for assistance, believing he had probable cause to search the vehicle. (*Id.* at 13, 15–16). After identifying Travis, Officer Arbuckle asked him about the smell of marijuana. (*Id.* at 13); (Gov't's Ex. 1 at 1:07:18–21). Travis said no one had smoked inside the vehicle, that he had a "sack of weed" and indicated toward the vehicle's center console. (Tr. at 16–17); (Gov't's Ex. 1 at 1:07:22–1:08:05). At this point, a second police car arrived with two police officers. (Tr. at 17); (Gov't's Ex. 1 at 1:08:57–1:09:02). Officer Arbuckle asked Travis to exit the vehicle, and asked if he had anything illegal on him and if he minded if Officer Arbuckle checked his pockets. (Tr. at 17); *see also* (Gov't Ex.

---

[6]     *See* Minn. Stat. § 169.19, subdiv. 5 ("A signal of intention to turn right or left shall be given continuously during not less than the last 100 feet traveled by the vehicle before turning.").

[7]     After Travis's vehicle turned right onto American Boulevard, a car came through the intersection traveling west on American Boulevard. (Tr. at 14). Thus, when Officer Arbuckle turned right onto American Boulevard, another, uninvolved car was between his vehicle and Travis's vehicle. (*Id.*).

1 at 1:08:57–1:09:28). Although Travis did not answer initially, Officer Arbuckle asked again, and Travis said, "go ahead, sir." (Tr. at 17–18); (Gov't Ex. 1 at 1:08:29–1:09:32). When Officer Arbuckle patted Travis's left front pocket, he felt a bulge that felt like a "baggie of narcotics." (Tr. at 18–19).[8] Officer Arbuckle removed the baggie and some United States currency from Travis's pocket. (*Id.* at 19). Officer Arbuckle handcuffed Travis and asked him if he was dealing dope and if crack was inside the baggie. (*Id.* at 19); (Gov't Ex. 1 at 1:09:45–1:10:00). Travis responded, "While you're at it, there's a firearm up under the seat." (Tr. at 19–20); (Gov't Ex. 1 at 1:10:01–04). Officer Arbuckle also recovered a keycard for room 455 at the Comfort Inn from Travis's person. (Tr. at 20–21). Officer Arbuckle conducted a search of the vehicle and located a black Ruger handgun under the driver's seat. (*Id.* at 21).

After processing Travis at the Bloomington jail, Officer Arbuckle returned to room 455 at the Comfort Inn to conduct a knock-and-talk because he believed the room was associated with narcotics use or sales.[9] (*Id.* at 22). A knock-and-talk is an attempt to make contact with a person and conduct further investigation. (*Id.* at 22). No one responded to several knocks, but Officer Arbuckle could hear a television inside the room (*Id.* at 22–23). He was concerned that someone was inside the room, refusing to answer the door. (*Id.* at 23). Thus, there was a potential that someone inside the room could have additional weapons and could be "laying in wait," or someone inside could be destroying additional evidence. (*Id.*). This was a concern for Officer Arbuckle because the traffic stop took place right outside the hotel, in the hotel parking lot, and it was possible that someone in the room watched the traffic stop from inside the room and saw Travis's arrest. (*Id.* at 23–24). Officer Arbuckle entered the hotel room and ensured that no

---

[8]    Officer Arbuckle later determined the baggie contained heroin. (Tr. at 26).
[9]    At this point, Officer Arbuckle had already confirmed that Travis rented the room the day before. (Tr. at 23).

people were inside. (*Id.* at 24–25). He "froze" the room, meaning he left everything in the room as it was and asked another officer, Detective Melser to obtain a search warrant. (*Id.* at 24); *see also* (*id.* at 56).[10] While Officer Arbuckle waited for the search warrant, a woman entered the room and was detained. (*Id.* at 25). When Detective Melser arrived with the search warrant, he and Officer Arbuckle searched the room. (*Id.* at 25–26). They found a shoebox containing "handgun ammunition, multiple magazines of handgun ammunition, . . . two narcotics scales, some plastic baggies for packaging narcotics[,] and . . . a large amount of the same powdery substance . . ." that was found on Travis's person and was later determined to be heroin. (*Id.* at 26).

The following day, Detective Melser interviewed Travis at the Bloomington jail in a recorded conversation. (*Id.* at 57); *see* (Gov't Ex. 2). Before the interview, Travis had been in custody overnight, with access to food, water, a bed, and a toilet. (Tr. at 60–61). Travis did not appear to be under the influence of any drugs or alcohol, nor did he complain of "discomfort or physical sickness." (*Id.* at 61). An approximately five-and-a-half-minute conversation took place before Detective Melser gave Travis a *Miranda* warning. (Gov't Ex. 2 at 2:55–8:23); *see also* (Tr. at 59). In response to Detective Melser's question of whether Travis was willing to waive his rights and speak to Detective Melser, Travis responded, "sure." (Tr. at 59); *see* (Gov't Ex. 2 at 8:44–9:34). Although Travis was upset about his girlfriend's arrest, the majority of the conversation was cordial. (*Id.* at 60).

## III. DISCUSSION

First, the Court addresses the Motion to Suppress Evidence from Travis's Cell and Motion to Suppress Wiretapping Evidence, which the Court recommends be denied as moot. The

---

[10]    Officer Arbuckle initially contacted the sergeant in charge of the narcotics unit, who then sent Detective Melser to get the search warrant. (Tr. at 24–25).

remaining Motions to Suppress are based on a series of events, beginning when Travis was stopped by Officer Arbuckle and concluding with Detective Melser's questioning of Travis in the Bloomington jail. *See generally* (Mots. to Suppress). Some of the evidence and statements that Travis seeks to suppress depend on the lawfulness of other evidence and statements. For this reason, the Court addresses each alleged constitutional violation in the chronological order in which it occurred.

### A. Evidence from Travis's Cell and Wiretapping Evidence

Travis seeks suppression of "any and all documents seized from the defendant's cell." (Mot. to Suppress Evidence from Travis's Cell). The Government represents that it is not aware of any such materials, and if there are any such materials, the Government will not offer them in its case-in-chief. (Gov't's Omnibus Resp. at 4). Based on the Government's representation that these materials do not exist, the Court recommends that the Motion to Suppress Evidence from Cell be denied as moot.

Travis also seeks to suppress evidence "obtained by electronic surveillance and wiretapping" and "any derivative evidence." (Mot. to Suppress Wiretapping Evidence). The Government represents that it is not aware of any such materials, and if there are any such materials, the Government will not offer them in its case-in-chief. (Gov't's Omnibus Resp. at 2). Based on the Government's representation that these materials do not exist, the Court recommends that the Motion to Suppress Wiretapping Evidence be denied as moot.[11]

---

[11] To the extent Travis's Motion to Suppress Wiretapping Evidence also seeks disclosure of said evidence, that issue has been addressed in a previous Court Order. *See* (Order Dated Nov. 3, 2014) [Doc. No. 45 at 2].

### B.    Traffic Stop

### 1.    Legal Standard

When an officer observes a violation of the law, he or she "has probable cause to initiate a traffic stop, and such a stop comports with the Fourth Amendment." *United States v. Bracamontes*, 614 F.3d 813, 816 (8th Cir. 2010) (citation and internal quotation marks omitted). An officer may detain an individual during a traffic stop "to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions." *United States v. Suitt*, 569 F.3d 867, 870 (8th Cir. 2009) (citation and internal quotation marks omitted). It is reasonable for an officer to ask "for the driver's license, the vehicle's registration, as well as inquir[e] about the occupants' destination, route, and purpose." *United States v. Sanchez*, 417 F.3d 971, 975 (8th Cir. 2005) (citation and internal quotation marks omitted). The individual may be detained "while the officer completes a number of routine but somewhat time-consuming tasks related to the traffic violation . . . ." *United States v. $404,905.00 in U.S. Currency*, 182 F.3d 643, 647 (8th Cir. 1999). These time-consuming tasks "may include a check of driver's license, vehicle registration, . . . criminal history, and the writing of the citation or warning." *United States v. Olivera-Mendez*, 484 F.3d 505, 509 (8th Cir. 2007). "An officer's suspicion of criminal activity may reasonably grow over the course of a traffic stop as the circumstances unfold and more suspicious facts are uncovered." *United States v. Linkous*, 285 F.3d 716, 720 (8th Cir. 2002).

### 2.    Analysis

Travis argues there was no reasonable suspicion for Officer Arbuckle to initiate a traffic stop for any of the three traffic violations. (Travis's Suppl. Mem. at 7–10). Travis also argues that Officer Arbuckle failed to address any of the violations with Travis after initiating the traffic stop. (Reply at 2–3). To the extent Travis argues that the stop did not comport with the Fourth

Amendment because Officer Arbuckle did not make any inquiries about the traffic violations, that argument is properly considered with respect to whether the scope of the stop was reasonable, and it is addressed separately from the instant discussion regarding whether Officer Arbuckle's initiation of the traffic stop complied with the Fourth Amendment.

The Court finds there was probable cause to stop Travis for each traffic violation because Officer Arbuckle observed three separate violations of state law.[12] The Court addresses each violation in turn.

### a.    Window Tint

Travis argues Officer Arbuckle did not have reasonable suspicion to stop Travis for a window tint violation because Officer Arbuckle testified that he did not know if Travis's vehicle, a Dodge Magnum, was exempt from that provision of state law because it might be considered a sport utility vehicle ("SUV") or a van. (Travis's Suppl. Mem. at 7–8); (Reply at 2). Additionally, Travis argues Officer Arbuckle did not determine whether the vehicle was a sedan, and therefore covered by the statute, until five months later. (Travis's Suppl. Mem. at 8); *see also* (Reply at 2).

---

[12]    "A traffic stop must be supported by reasonable suspicion or probable cause." *United States v. Hollins*, 685 F.3d 703, 706 (8th Cir. 2012) (citation and internal quotation marks omitted). Travis argues the appropriate analysis is whether there was reasonable suspicion for an investigatory stop, commonly referred to as a *Terry* stop. (Travis's Suppl. Mem. at 7–10); *see United States v. Hightower*, 716 F.3d 1117, 1119 (8th Cir. 2013) (citing *Terry v. Ohio*, 392 U.S. 1 (1968)). A *Terry* stop is justified when there is reasonable suspicion that the individual being stopped is currently engaged in criminal activity or previously committed a crime. *United States v. Hughes*, 517 F.3d 1013, 1016 (8th Cir. 2008) (citations omitted). Each of the three reasons Officer Arbuckle identified for stopping Travis are violations of state law, which, by their definition, constitute probable cause. *See Bracamontes*, 614 F.3d at 816. Because the Court finds that Officer Arbuckle had probable cause to initiate a traffic stop and because probable cause is a higher standard than reasonable suspicion, the Court necessarily finds Officer Arbuckle had reasonable suspicion to initiate a traffic stop. *See United States v. Horton*, 611 F.3d 936, 940 (8th Cir. 2010) ("Reasonable, articulable suspicion for a *Terry* stop requires less than probable cause of criminal activity, but the suspicion cannot be based on an 'inarticulate hunch[].'" (quoting *Terry*, 392 U.S. at 22)).

Officer Arbuckle testified that he is aware that an SUV or van is exempt from the state statute prohibiting tinting that permits less that fifty percent of light through the window. (Tr. at 46–47); *see also* Minn. Stat. § 169.71, subdiv. 4(b)(3)(ii) (stating that the subdivision about tinting does not apply to "the rear windows or the side windows on either side behind the driver's seat of a van as defined in [Minnesota Statute] section 168.002, subdivision 40[.]"). But Officer Arbuckle testified that he did not know if a Dodge Magnum was classified as an SUV or van. (Tr. at 46). When asked "[A Dodge Magnum] is certainly not a sedan; is that correct?," Officer Arbuckle replied, "I would say it's a sedan, maybe a station wagon." (*Id.*). The Court finds Officer Arbuckle's testimony, which demonstrates that he believed that Travis's vehicle was a sedan with windows tinted in violation of state law, credible. *See* (*id.*); *see also* (*id.* at 6) (Officer Arbuckle's testimony stating that he believed Travis's vehicle had "extremely dark tint" and was in violation of state law). Because Officer Arbuckle observed a violation of state law, he had probable cause to initiate a traffic stop. *See Bracamontes*, 614 F.3d at 816.

Even if Officer Arbuckle was mistaken and a Dodge Magnum is in fact considered a vehicle eligible for an exception under the window tint statute, the Court's finding does not change. If a mistake of fact is alleged, the inquiry is whether the mistake was objectively reasonable under the circumstances. *United States v. Smart*, 393 F.3d 767, 770 (8th Cir. 2005). The Court finds Officer Arbuckle's testimony credible on the subject of his belief that Travis's vehicle was required to comply with the statute, and that it did not. Therefore, even if Officer Arbuckle did make a mistake, it was reasonable under the circumstances.

To the extent that Travis argues Officer Arbuckle was not confident in his assessment that Travis's vehicle was required to comply with the window tinting statute, the Court construes this as an argument that the traffic stop was initiated based on pretext. (Travis's Suppl. Mem. at

10

8); (Reply at 2); *see also* (Mem. in Supp. of Mots. to Suppress Evidence) [Doc. No. 39 at 2–3]. Travis identifies no specific pretext, and even if he had, and even if the Court found Officer Arbuckle had some ulterior motivation, it is irrelevant because the Court determines that Officer Arbuckle had probable cause to initiate the traffic stop based on his observation that Travis's vehicle did not comply with the window-tint statute.[13] *See United States v. Bell*, 86 F.3d 820, 822 (8th Cir. 1996) ("If the officer has probable cause to stop the [traffic law] violator, the stop is objectively reasonable and any ulterior motivation on the officer's part is irrelevant.").

The Court concludes Officer Arbuckle had probable cause to initiate a traffic stop based on his observation that Travis's vehicle had window tint that did not comply with state law.

### b.    Windshield Obstruction

Travis argues Officer Arbuckle did not have reasonable suspicion to initiate a traffic stop based on an obstruction he viewed hanging from Travis's review mirror because Officer Arbuckle was not able to describe the object with accuracy and there is no other evidence of the obstruction. (Travis's Suppl. Mem. at 9); (Reply at 2). Additionally, Officer Arbuckle only speculated as to how it was attached or otherwise fell into one of the exceptions that permits some devices to be attached to windshields, and conducted no further inquiry. (Travis's Suppl. Mem. at 9); (Reply at 2).

Minnesota law makes it unlawful to have an item "suspended between the driver and the windshield" that is not one of the following: sun visor, rearview mirror, driver feedback and safety monitoring equipment that is mounted as described by the statute, global positioning or navigation systems when mounted as described by the statute, and toll collection equipment.

---

[13]    Although not relevant to this portion of the analysis, Officer Arbuckle testified that prior to transporting Travis to jail, he determined that Travis's vehicle only permitted nineteen percent of light through the window, and was not in compliance with state law. (Tr. at 26–27).

Minn. Stat. § 169.71, subdiv. 1(a)(2). Officer Arbuckle testified that he observed an obstruction, which appeared to be flowers, hanging from the review mirror.[14] (Tr. at 8). Thus, based on Officer Arbuckle's testimony, which the Court finds credible, Officer Arbuckle observed a violation of state law and therefore had probable cause to initiate a traffic stop. *See Bracamontes*, 614 F.3d at 816.

To the extent Travis argues that Officer Arbuckle's inability to specifically identify the object that obstructed the windshield or Officer Arbuckle's failure to cite Travis for the violation or obtain the object as evidence suggests that Officer Arbuckle initiated the traffic stop as a pretext for detaining Travis, the argument is unavailing. Travis identifies no specific pretext, and even if he had, and even if the Court found Officer Arbuckle had some ulterior motivation, it is irrelevant because the Court determines that Officer Arbuckle had probable cause to initiate the traffic stop based on his observation that Travis's vehicle had an obstruction between the driver and the windshield in violation of state law. *See Bell*, 86 F.3d at 821.

To the extent Travis argues that Officer Arbuckle made a factual mistake, i.e., that the object ostensibly obstructing the windshield was one permitted by statute, the inquiry is whether Officer Arbuckle's mistake was objectively reasonable under the circumstances. *See Smart*, 393 F.3d at 770. The Court finds that any mistake Officer Arbuckle may have made was objectively reasonable under the circumstances and in consideration of his credible testimony.

---

[14]    To the extent Travis argues that "Officer Arbuckle was not willing to say that the object was a flower[,]" the Court finds this statement contradicted by the evidence. (Reply at 2) (citing Tr. at 44). Although Officer Arbuckle testifies, in the portion of the transcript specifically referred to by Travis, that he does not believe the flowers were biological, he consistently testified that the object "looked like flowers." (Tr. at 44); *see also* (Tr. at 8).

### c.   Turn Signal

Travis argues Officer Arbuckle did not have reasonable suspicion to stop Travis for a turn-signal violation because Officer Arbuckle was 300 feet behind Travis when Travis was at the stop sign. (Travis's Suppl. Mem. at 8). Specifically, Travis argues that Officer Arbuckle did not testify to his observations of Travis's vehicle when it was 100 feet before the stop sign— when a turn signal is required to be activated—and Officer Arbuckle "may not have seen the signal until he got closer to the Travis vehicle. [Officer] Arbuckle suspected a negative, the absence of a turn signal, when he was not in a position to positively identify that it happened." (*Id.* at 8–9); *see also* (*id.* at 9–10); (Reply at 3).

The Court finds Officer Arbuckle had probable cause to suspect a turn-signal violation. Officer Arbuckle testified Travis was initially stopped without a turn signal, and subsequently activated his turn signal. (Tr. at 9); *see also* (Tr. at 37–38). Officer Arbuckle's ability to see Travis's vehicle 100 feet before the stop sign is irrelevant because when Officer Arbuckle saw Travis's vehicle at the stop sign, the turn signal was not activated. (*Id.* at 9). Because the Court finds Officer Arbuckle's testimony credible, it finds Officer Arbuckle had probable cause to initiate a traffic stop because he observed a violation of state law. *See Bracamontes*, 614 F.3d at 816.

### C.   Statement about the "Sack of Weed"

Travis essentially argues that, at the time he made the statement about the "sack of weed," he was "arrested" or in "the process of arrest initiated with [Officer] Arbuckle's call for backup" for the purposes of *Miranda* warnings. (Travis's Suppl. Mem. at 14). Travis describes the questioning while he was still in his vehicle as an "interrogation," and cites cases that support the idea that "a person being interrogated subject to his seizure may not understand that he is free

to remain silent," and a "seized individual may believe himself to be in custody from his point of view." (*Id.*) (citing *Arizona v. Johnson*, 555 U.S. 323 (2009); *Berkemer v. McCarty*, 468 U.S. 420, 441 (1984)). The Government argues Travis was not under arrest, or subject to the "functional equivalent of arrest" at the time of his statements about the weed. (Gov't's Suppl. Mem. at 15).

### 1.    Legal Standard

The Fifth Amendment provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself . . . ." U.S. Const. amend. V. In *Miranda v. Arizona*, the Supreme Court adopted measures to ensure that a suspect is advised of his or her Fifth Amendment rights before custodial interrogations. 384 U.S. 436, 444–45 (1966). Consequently, "*Miranda* . . . prohibits the government from introducing into evidence statements made by a defendant during a custodial interrogation unless the defendant has been previously advised of his [F]ifth [A]mendment privilege against self-incrimination and right to an attorney." *United States v. Chipps*, 410 F.3d 438, 445 (8th Cir. 2005) (citing *Miranda*, 384 U.S. at 444). Nevertheless, law enforcement officers "are not required to administer *Miranda* warnings to everyone whom they question." *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977). *Miranda*'s requirements are applicable only where a person has been "'taken into custody or otherwise deprived of his freedom of action in any significant way . . . .'" *Stansbury v. California*, 511 U.S. 318, 322 (1994) (quoting *Miranda*, 384 U.S. at 444).

"'Two discrete inquiries are essential to the [custody] determination: first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave.'" *United States v. LeBrun*, 363 F.3d 715, 720 (8th Cir. 2004) (quoting *Thompson v. Keohane*, 516

U.S. 99, 112 (1995)). "Thus, the critical inquiry is not whether the interview took place in a coercive or police dominated environment, but rather whether the defendant's 'freedom to depart was restricted in any way.'" *Id.* (quoting *Mathiason*, 429 U.S. at 495). To answer this question, a court considers the totality of the circumstances, "keeping in mind that the determination is based 'on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned.'" *Id.* (quoting *Stansbury*, 511 U.S. at 322–23).

When a driver is detained to pursuant to a traffic stop, "the officer may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions." *Berkemer*, 468 U.S. at 439. In *Berkemer*, the Supreme Court acknowledged that a person subject to a traffic stop is not free to leave. *Id.* at 436–37. But the Court went on to say that because a traffic stop is typically temporary and brief, and the motorist is not "completely at the mercy of the police," the nature of a traffic stop is more like a *Terry* stop than a formal arrest. *Id.* at 437–40. For these reasons, the Court held that in the circumstances of a traffic stop, like those of a *Terry* stop, "persons temporarily detained pursuant to such stops are not 'in custody' for the purposes of *Miranda*." *Id.* at 440. Nonetheless, when "a motorist who has been detained pursuant to a traffic stop thereafter is subjected to treatment that renders him 'in custody' for practical purposes, he will be entitled to the full panoply of protections prescribed by *Miranda*." *Id.*

"If, during a traffic stop, an officer develops a reasonable, articulable suspicion that a vehicle is carrying contraband, he has 'justification for a greater intrusion unrelated to the traffic offense.'" *United States v. Bloomfield*, 40 F.3d 910, 918 (8th Cir. 1994) (quoting *United States v. Cummins*, 920 F.2d 498, 502 (8th Cir. 1990)). "Whether an officer has reasonable suspicion to

expand the scope of a stop is determined by looking at 'the totality of the circumstances, in light of the officer's experience.'" *Sanchez*, 417 F.3d at 975 (quoting *United States v. Carrate*, 122 F.3d 666, 668 (8th Cir. 1997)).

### 2.    Analysis

As an initial matter, and although not directly challenged by Travis, the Court finds Officer Arbuckle had reasonable suspicion to extend the traffic stop because Officer Arbuckle smelled marijuana and Travis admitted there was marijuana in the vehicle.[15] (Tr. 13, 15–17). Thus, Officer Arbuckle had, at a minimum, reasonable, articulable suspicion that the vehicle possessed contraband. *See Bloomfield*, 40 F.3d at 918 ("If, during a traffic stop, an officer develops a reasonable, articulable suspicion that a vehicle is carrying contraband, he has justification for a greater intrusion unrelated to the traffic offense." (internal quotation marks omitted)).

With respect to whether a *Miranda* warning was required, the Court finds that Travis was not in custody at the time he made the statement about the "sack of weed." Officer Arbuckle asked Travis, while Travis was still sitting in his vehicle, about marijuana based on the smell of marijuana coming from the car. (Tr. at 13). In other words, to the extent asking Travis about the smell of marijuana extended the traffic stop, Officer Arbuckle was seeking information that would confirm or dispel his suspicion that Travis had marijuana on his person or in his vehicle. *See Berkemer*, 468 U.S. at 439–40; *see also United States v. Boucher*, 909 F.2d 1170, 1174 (8th Cir. 1990) (finding it was reasonable for a police officer to question the defendant about weapons without *Miranda* warnings where the police officer had already observed a weapon in the

---

[15]    *See, e.g.*, (Travis's Suppl. Mem. at 12) (stating that "[t]he pat-down was improperly extended the search and seizure of Travis's person [sic] . . . ."); (Reply at 2–3) (arguing Officer Arbuckle did not address any of the state law violations with Travis).

defendant's vehicle); *United States v. McGauley*, 786 F.2d 888, 890 (8th Cir. 1986) ("No *Miranda* warning is necessary for persons detained for a *Terry* stop.").

In the Eighth Circuit, for example, when an individual was questioned while sitting in the front seat of a patrol car, he was not in custody for the purposes of *Miranda* where he was not handcuffed, was not told his detention would be anything other than temporary, the officer's questions were limited in scope, and the officer's tone was conversational. *United States v. Coleman*, 700 F.3d 329, 336 (8th Cir. 2012). In another case, the Eighth Circuit found the defendant was not in custody when he answered "yes" to the question of whether there was anything in the car the police officer should know about and when the defendant was asked to exit the vehicle, was sitting in the patrol car, he was asked only a modest number of questions, and he was not informed his detention would be anything but temporary. *United States v. Martin*, 411 F.3d 998, 1002–03 (8th Cir. 2005).

Additionally, the traffic stop and investigatory expansion of the stop was brief, and Officer Arbuckle's questions were limited to his suspicions about Travis having marijuana based on the smell coming from Travis's vehicle. The Court cannot conclude that calling for back up rises to a level of restraint on Travis's freedom more than the restraint inherently associated with a traffic stop. *See Berkemer*, 468 U.S. at 436–40. Thus, Travis was not "in custody" for *Miranda* purposes when he told Officer Arbuckle about the marijuana in his vehicle.

Travis cites *Arizona v. Johnson* for the proposition that "a person being interrogated subject to his seizure may not understand that he is free to remain silent." (Travis's Suppl. Mem. at 14) (citing *Johnson*, 555 U.S. 323). In *Johnson*, the United States Supreme Court found that the defendant, a passenger in a vehicle pulled over for a *Terry* stop, was not free to leave when asked to exit the vehicle. 555 U.S. at 333–34. Nevertheless, the Court found the police officer

17

was justified in asking the defendant questions unrelated to the traffic stop based on the officer's observations of the defendant's clothing, and the police officer was justified in searching defendant for a weapon in order to protect the officer's safety. *Id.* The Court noted that "[a]n officer's inquiries into matters unrelated to the justification for the traffic stop, . . . do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop." *Id.* at 333. Here, the very few questions Officer Arbuckle asked Travis were confined to his recognition of the smell of marijuana, and did not expand the stop beyond the time necessary to confirm or dispel his concerns about the marijuana odor.

Because the Court finds Travis was not in custody for the purposes of *Miranda*, the Court recommends that, to the extent the Motions to Suppress Statements seek suppression of Travis's statement about the "sack of weed," they be denied.

### D.   Search of Travis's Pocket

Travis argues the heroin and Comfort Inn keycard should be suppressed. (Travis's Suppl. Mem. at 10–12).[16] Specifically, he argues Officer Arbuckle's pat-down of his person lacked reasonable suspicion that Travis was armed and dangerous because Travis did not say he had any dangerous weapons on him, and there was nothing to otherwise indicate Travis was armed and dangerous. (*Id.* at 10–11); (Reply at 3). Travis also argues that his consent to be searched was not valid because he was in custody rather than temporarily detained. (Travis's Suppl. Mem. at 11–12); (Reply at 3–4). Additionally, Travis argues that "someone already under police control of

---

[16]    In the context of arguing for suppression of evidence obtained as the result of the search warrant executed in Travis's room at the Comfort Inn, Travis argues the key card was the "fruit of an illegal-pat down[.]" (Travis's Suppl. Mem. 13). Thus, the Court address the admissibility of the heroin and the keycard together, because they were both seized as a result of the search of Travis's pockets, although the timing of the discovery of the keycard is not clear. *See* (Tr. at 20–21).

the scene in a stop cannot further authorize an illegal search." (Travis's Suppl. Mem. at 12) (citing *Johnson*, 555 U.S. 323).

The Government does not make any argument about the pat-down; instead, the Government appears to argue that Travis's consent applied to the entire situation—the pat-down and the pocket search—and argues Travis voluntarily consented to the search. (Gov't's Suppl. Mem. at 11–13). The Government argues that even if Travis's consent was not voluntary, the evidence found as a result of the pocket search would be admissible under the inevitable discovery doctrine. *See* (*id.* at 13–14).

The Government does not argue that Travis was patted down due to Officer Arbuckle's reasonable suspicion that Travis was armed and dangerous, nor did it elicit any such testimony from Officer Arbuckle. *See generally* (Gov't's Suppl. Mem.); *see United States v. Binion*, 570 F.3d 1034, 1039 (8th Cir. 2009) (stating that a pat-down search or "protective frisk" for officer safety is warranted when "specific articulable facts taken together with rational inferences support the reasonable suspicion that a party was potentially armed and dangerous." (internal quotation marks omitted)). Thus, for the purposes of this Report and Recommendation and in order to adequately consider Travis's argument that "someone already under police control of the scene in a stop cannot further authorize an illegal search[,]" the Court first presumes the pat-down was illegal and addresses whether Travis's consent was voluntary.[17] *See* (Travis's Suppl. Mem. at 12). The Court then considers whether Travis's consent can purge the taint of the illegal

---

[17]    Travis also states "Travis's apparent consent to the pat[-]down does not avoid suppression of the evidence obtained or the fruits of that tainted evidence at the hotel." (Travis's Suppl. Mem. at 12). Thus, it is not clear whether Travis considers the pat-down and pocket search the same activity, or separate activities. The Court takes the more constitutionally cautious approach and considers the pat-down separate from the pocket search. Asking Travis to exit the vehicle, however, did not violate the Fourth Amendment because asking a driver to exit the vehicle incident to a traffic stop is permitted. *See Pennsylvania v. Mimms*, 434 U.S. 106, 111 n.6 (1977).

pat-down. *See United States v. Becker*, 333 F.3d 858, 860–63 (8th Cir. 2003) (finding the defendant's voluntary consent was sufficient to taint the purge of an assumed unlawful detention). The Court concludes its analysis of the pocket search by determining whether the heroin and keycard would have been discovered inevitably.

### 1.      Voluntary Consent

"[A] consent to a search is voluntary unless, in light of all the circumstances, pressures exerted upon the suspect have overborne his will." *United States v. Magness*, 69 F.3d 872, 847 (8th Cir. 1995) (internal quotation marks omitted). A court considers four factors related to the individual:

> (1) the individual's age and mental ability; (2) whether the individual was intoxicated or under the influence of drugs; (3) whether the individual was informed of [his or her] *Miranda* rights; and (4) whether the individual was aware, through prior experience, of the protections that the legal system provides for suspected criminals.

*United States v. Golinveaux*, 611 F.3d 956, 959 (8th Cir. 2010) (internal quotation marks omitted). A court also considers six environmental factors:

> (1) the length of the detention; (2) whether the police used threats, physical intimidation, or punishment to extract consent; (3) whether the police made promises or misrepresentations; (4) whether the individual was in custody or under arrest when consent was given; (5) whether the consent was given in public or in a secluded location; and (6) whether the individual stood by silently or objected to the search.

*Id.* The Court considers all ten factors together and discusses them in two groups: those factors that weigh against finding Travis's consent was voluntary, and those factors that weigh in favor of finding Travis's consent was voluntary.

The following factors weigh against finding Travis's consent was voluntary. First, Travis was not read his *Miranda* rights. *See generally* (Gov't Ex. 1 at 1:08:57–1:10:51) (covering the period of time beginning when Travis exited the vehicle and ending when he was placed in the squad car). Second, Travis was not free to leave. At the time of Officer Arbuckle's question to

Travis regarding whether Travis "minded" if Officer Arbuckle searched his pockets, Officer Arbuckle was holding both of Travis's hands behind his head. (*Id.* at 1:09:14–33). Additionally, Travis had a police officer on either side of him. *See* (*id.* at 1:09:14–1:10:11). Therefore, Travis was not free to leave.

The following factors weigh in favor of finding Travis's consent was voluntary. First, Travis is an adult who is not known to have any mental difficulties, and he identified at least one prior arrest to Officer Arbuckle, suggesting prior experience with the legal system. (*Id.* at 1:08:30–1:09:00). Second, Travis was not under the influence of drugs. Officer Arbuckle noticed the smell of marijuana, and Travis appears to say that he smoked marijuana "earlier." (*Id.* at 1:08:01–05). Officer Arbuckle did not testify that Travis seemed to be affected by marijuana, and nothing else in the record to suggest that he was. *See United States v. Dunning*, 666 F.3d 1158, 1165 (8th Cir. 2012) (stating that "although [the defendant] smelled of marijuana, nothing in the record supports a finding that [the defendant] was under the influence of drugs" and finding that factor supported a finding that defendant voluntarily consented to a search). Third, the length of detention was relatively short: the amount of time between when Travis exited the vehicle and when Officer Arbuckle asked to search his pockets was less than one minute.[18] (Gov't Ex. 1 at 1:08:57–1:09:27). Fourth, Officer Arbuckle made no promises or misrepresentations.[19] Fifth, Travis was not physically intimidated. Although he was restrained, he was not otherwise

---

[18]     The Government measures the length of detention beginning when Officer Arbuckle first approached the vehicle. (Gov't's Suppl. Mem. at 12). The Court measures the length of detention beginning when Officer Arbuckle asked Travis to exit the vehicle because it was at that point that the traffic stop converted to an investigatory stop under *Terry*. Regardless of how the time is measured, the detention was brief.

[19]     When Officer Arbuckle first speaks to Travis while Travis is still in his vehicle, Officer Arbuckle asks him if there is anything in the vehicle and goes on to say something like, "If we find something when we're searching that you don't tell me about, you're likely to be charged with it." (Gov't's Ex. 1 at 1:07:40–48). The Court finds this is a statement of information, and it does not contain any promise or misrepresentation.

physically threatened in any way. Sixth, the search took place in a public location—the parking lot of the Comfort Inn. Seventh, and finally, Travis "stood by silently," and did not object to the search. *See* (*id.* at 1:09:24–1:10:10).

In consideration of all the circumstances surrounding Travis's consent to be searched, the Court finds Travis's consent was voluntary. The two factors that weigh in favor of finding the consent involuntary are not dispositive of the issue, in whole or in part. First, the Eighth Circuit does not require a suspect to be given *Miranda* warnings in order to find consent voluntary. *See, e.g.*, *United States v. Saenz*, 474 F.3d 1132, 1137 (8th Cir. 2007) ("We have not required an officer to provide *Miranda* warnings before requesting consent to search or held that an absence of *Miranda* warnings would make an otherwise voluntary consent involuntary."). Second, Travis asserts he "was in the process of being handcuffed . . . and was placed into custody . . . ." (Reply at 3). The Eight Circuit has found that the use of handcuffs is not determinative of the voluntariness of consent. *United States v. Comstock*, 531 F.3d 667, 677 (8th Cir. 2008). But even if Travis was formally under arrest, that fact alone, especially in the totality of these circumstances, does not compel a finding that Travis's consent was involuntary. "[E]ven persons who have been arrested and are in custody can voluntarily consent to a search . . . ." *United States v. Chaidez*, 906 F.2d 377, 382 (8th Cir. 1990).[20]

The majority of the factors to be considered support a finding that Travis's consent was voluntary: Travis is an adult with no identified mental difficulties and was not under the

---

[20]    Travis cites *Robinson* in support of the proposition that "[c]ase law cited that temporary handcuffing does not compromise voluntariness, does not apply to this arrest in which the handcuffing was not temporary." (Reply at 4) (citing *Robinson*, 20 F.3d at 322–23). But as discussed above, whether a defendant was handcuffed or in custody is only one factor of this analysis, and is not dispositive. *See Chaidez*, 906 F.2d at 382. In *Robinson*, the Court similarly stated that the fact "[t]hat Robinson made the statement while handcuffed . . . may well demonstrate that he was in custody . . . , but does not establish that the statement was made involuntarily." *Robinson*, 20 F.3d at 323.

influence of drugs. The length of the detention before Travis's consent was short, Officer Arbuckle made no promises or misrepresentations, and neither he nor the other officers physically intimidated Travis. The search took place in a public location and Travis did not object to the search. *See United States v. Capps*, 716 F.3d 494, 497 (8th Cir. 2013) ("The district court did not clearly err because the substantial majority of these factors weigh in favor of finding that [the defendant] voluntarily consented to the search."); *see also United States v. Buenrostro*, 454 F. App'x 523, 526 (8th Cir. 2011) (finding the defendant's consent was voluntary even when he consented while sitting in a patrol car, was not informed that he could refuse to consent, and English was not his first language and remaining factors favored a finding that consent was voluntary); *United States v. Willie*, 462 F.3d 892, 896–97 (8th Cir. 2006) (finding that the defendant's consent was voluntary when, at the time of his consent, he was under arrest, he did not receive *Miranda* warnings, and he was under the influence of methamphetamine).

Based on a totality of the circumstances, the Court finds that Travis's consent to the pat-down search was voluntary.

## 2.      Whether Consent Purges the Taint of an Illegal Pat-Down

Travis argues that Travis's "consent could not authorize an impermissible pat-down." (Travis's Suppl. Mem. at 12). An individual may consent to a search, even if the activity leading up to the search involved unlawful police conduct. *Becker*, 333 F.3d at 860–63. For the taint of unlawful conduct to be purged by voluntary consent, the Court examines three factors to determine whether the voluntary consent was "an independent, lawful cause of the search": "(1) the temporal proximity between the Fourth Amendment violation and the grant of consent to search; (2) the presence of any intervening circumstances; and (3) the purpose and flagrancy of

the officer's Fourth Amendment violation." *United States v. Barnum*, 564 F.3d 964, 971 (8th Cir. 2009) (citing *Brown v. Illinois,* 422 U.S. 590, 603–04 (1975); *United States v. Herrera–Gonzalez,* 474 F.3d 1105, 1111 (8th Cir. 2007)). "[T]he purpose and flagrancy of the official misconduct is 'the most important factor because it is directly tied to the purpose of the exclusionary rule–deterring police misconduct.'" *Herrera-Gonzalez*, 474 F.3d at 1111 (quoting *United States v. Simpson*, 439 F.3d 490, 496 (8th Cir. 2006)).

The amount of time between when Officer Arbuckle begins to pat Travis down and when he asks for Travis's consent is only a few seconds. (Gov't Ex. 1 at 1:09:25–27). But the Eighth Circuit has found that a short time frame between the unlawful activity and the consent is not dispositive where "other circumstances indicate the consent was sufficiently an act of free will." *Herrera–Gonzalez,* 474 F.3d at 1112. There were no intervening circumstances between the beginning of the pat-down and the consent. *See* (Gov't Ex. 1 at 1:09:25–27). These factors weigh in favor of suppression.

The "purpose and flagrancy" of the unlawful conduct deserves "particular emphasis." *United States v. Greer*, 607 F.3d 559, 564 (8th Cir. 2010) (internal quotation marks omitted) (citing *Brown*, 422 U.S. at 604). Here, despite the lack of testimony from Officer Arbuckle on this subject, the purpose of the pat-down appears to be for officer safety. *See United States v. Whisenton*, 765 F.3d 938, 942–43 (8th Cir. 2014) (assuming that exigent circumstances did not justify agents entry into defendant's home but nonetheless considering the agents' safety concerns when analyzing whether their conduct was a purposeful and flagrant violation of the defendant's Fourth Amendment rights). As Officer Arbuckle is accompanying Travis behind his vehicle, he asks Travis if Travis has anything "on him" that Officer Arbuckle needs to be aware of or if he has anything sharp. (Gov't Ex. 1 at 1:09:04–18). This suggests that the purpose of

24

the pat-down was not "executed in the hope that something might turn up." *Whisenton*, 765 F.3d at 942 (internal quotation marks omitted); *cf.* (Travis's Suppl. Mem. at 13) ("The frisk consented to was apparently a pretext designed to facilitate a search for drugs, not weapons . . . .").

Likewise, the Court cannot conclude that any unlawful conduct was a flagrant violation of Travis's Fourth Amendment rights. As stated above, Officer Arbuckle appeared to be concerned for his safety. *See* (Gov't's Ex. 1 at 1:09:04–18). The few seconds of pat-down that took place before Travis gave his consent were not overly intrusive, and did not exceed the apparent scope of checking Travis for weapons. *See* (*id.*). Officer Arbuckle did not reach into Travis's pocket until after he had obtained Travis's consent, which shows the scope of the pat-down was narrow. (*Id.* at 1:09:25–47).

The Court finds that the purpose and flagrancy factor weighs in favor of the Government. Because particular emphasis must be placed on this final factor, the Court finds that Travis's consent was "sufficiently voluntary to purge the taint" of the presumed unlawful pat-down. *See Becker*, 333 F.3d at 861. Even if, however, Travis's consent was not voluntary, or did not purge the taint of the unlawful pat-down, the Court finds the heroin and keycard would have been inevitably discovered.

### 3.    Inevitable Discovery

The Government argues that even if Travis's consent was involuntary, the evidence obtained as a result of searching Travis's pockets is admissible under the inevitable discovery doctrine. (Gov't's Suppl. Mem. at 13). Specifically, the Government argues Officer Arbuckle had probable cause to search the vehicle, and that search would have yielded the firearm. (*Id.*). Travis would have been arrested for possessing a firearm as a felon, and Travis's person would have been searched incident to that arrest. (*Id.* at 13–14). A search of Travis's person would have

led to the discovery of heroin in Travis's pocket and the keycard. (*Id.*). Travis did not address

this argument. *See generally* (Travis's Suppl. Mem.); (Reply).

Evidence obtained in violation of constitutional provisions may be admitted if it would

have been inevitably discovered absent any "overreaching by the police . . . ." *Nix v. Williams*,

467 U.S. 431, 447 (1984). Under this theory,

> the government must prove by a preponderance of the evidence: (1) that there was a
> reasonable probability that the evidence would have been discovered by lawful means in
> the absence of police misconduct, and (2) that the government was actively pursuing a
> substantial, alternative line of investigation at the time of the constitutional violation.

*United States v. Conner*, 127 F.3d 663, 667 (8th Cir. 1997).

The Court finds that the heroin and keycard discovered on Travis's person would have

been inevitably discovered. First, the heroin and keycard would have been discovered when

Travis was arrested for being a felon in possession of a firearm. As discussed in further detail

below, at the time of the pocket search, Officer Arbuckle had probable cause to search Travis's

vehicle because he smelled marijuana and Travis told Officer Arbuckle that there was marijuana

in the car. (Tr. at 13, 15–17). A search of the vehicle would have yielded the firearm. (*Id.* at 21).

Because Travis is a felon, his possession of the firearm was unlawful, and Officer Arbuckle

would have had probable cause to arrest Travis for that offense. *See* 18 U.S.C. §§ 922(g)(1),

924(a)(2); Minn. Stat. § 624.713. Travis's person would have been searched incident to arrest.

*United States v. Robinson*, 414 U.S. 218, 235 (1973) ("A custodial arrest of a suspect based on

probable cause is a reasonable intrusion under the Fourth Amendment; that intrusion being

lawful, a search incident to the arrest requires no additional justification. It is the fact of the

lawful arrest which establishes the authority to search, and we hold that in the case of a lawful

custodial arrest a full search of the person is not only an exception to the warrant requirement of

the Fourth Amendment, but is also a 'reasonable' search under that Amendment."); *United States*

*v. Jones*, 479 F.3d 975, 978 (8th Cir. 2007) ("A full search of an arrestee and the area within an arrestee's immediate control for both weapons and evidence may be made during a search incident to arrest."). Because the heroin and keycard were in Travis's pocket, it would have been discovered during the search incident to arrest.

### 4.    Conclusion Regarding Pocket Search

The Court finds that even if the pat-down was illegal, Travis voluntarily consented to the pocket search and his consent was sufficient to cure the taint of the illegal pat-down. Alternatively, the evidence recovered from Travis's pocket, the heroin and hotel keycard, would have been discovered inevitably. For these reasons, the Court recommends that the Motions to Suppress Physical Evidence be denied to the extent they seek suppression of the heroin and keycard found in Travis's pocket.

### E.    Firearm Statement

After Officer Arbuckle found the heroin in Travis's pocket, Travis told Officer Arbuckle there was a firearm under the seat of the car. (Tr. at 19–20). Travis argues this statement should be suppressed because at the time of the statement, Travis was "significantly deprived of his freedom of action and apparently under arrest[,]" and was interrogated about matters outside the exceptions permitted regarding public safety, making the statement not spontaneous. (Travis's Suppl. Mem. at 14–15). The Government argues Travis was not in custody, and even if he was, the statement about the gun was spontaneous and was not made in response to questioning. (Gov't's Suppl. Mem. at 15–16).[21]

---

[21]    Because the Government does not rely on the public safety exception to statements made without a *Miranda* warning, the Court does not address Travis's argument on this theory. *See* (Travis's Suppl. Mem. at 14–15).

The Court relies on the legal standard previously described in connection with Travis's statement about the "sack of weed." *See supra* at 13–18.

In support of its argument that Travis was not in custody, the Government states only the following: "[e]ven application of handcuffs does not necessarily lead to a finding of custody under the *Berkemer* analysis." (Gov't's Suppl. Mem. at 15). A police officer may handcuff a suspect without converting the encounter into an arrest. *United States v. Martinez*, 462 F.3d 903, 907 (8th Cir. 2006); *but see El-Ghazzawy v. Berthiaume*, 636 F.3d 452, 457 (8th Cir. 2011) ("[T]he use of handcuffs is greater than a de minimus intrusion and thus requires the officer to demonstrate that the facts available to the officer would warrant a man of reasonable caution in the belief that the action taken was appropriate." (internal quotation marks and alteration omitted)). The Government addresses no other circumstances surrounding Travis's statement that bear on the question of custody. At the time of Travis's statement about the gun, he was in the process of being handcuffed by Officer Arbuckle. (Gov't's Ex. 1 at 1:09:54–1:10:10). He had an additional police officer on each side of him, and he had just been told that Officer Arbuckle smelled marijuana in the car and asked about other drugs. (*Id.* at 1:07:17–1:10:10). The Court finds that a reasonable person would not be free to leave in these circumstances, and therefore Travis was in custody for the purposes of whether a *Miranda* warning was required. *See Martinez*, 462 F.3d at 909 (finding a reasonable person would not feel free to leave where the defendant "was detained by two officers, patted down for weapons (with none being found), and closely questioned about his possession of weapons. Then, he was handcuffed and told he was being further detained. This occurred before being questioned by the two officers.").

Because Travis was in custody when he made the statement about the firearm, Travis's statement can only be admitted in the absence of a *Miranda* warning if it was voluntary and not

in response to an interrogation. *See United States v. McGlothen*, 556 F.3d 698, 701 (8th Cir. 2009). "An interrogation includes both direct questions and words or actions that officers should know are reasonably likely to elicit an incriminating response from the suspect." *Id.* (citation and internal quotation marks omitted).

Travis does not argue that his statement was involuntary, and the Court independently finds it was voluntary. "A statement is involuntary when it was extracted by threats, violence, or express or implied promises sufficient to overbear the defendant's will and critically impair his capacity for self-determination." *United States v. Vega,* 676 F.3d 708, 718 (8th Cir. 2012) (citation and internal quotation marks omitted). A court makes its determination under the totality of the circumstances and "considers, among other things, the degree of police coercion, the length of the interrogation, its location, its continuity, and the defendant's maturity, education, physical condition, and mental condition." *Id.* (internal quotation marks omitted). As discussed in more detail above in connection with whether Travis's consent to search his pocket was voluntary, the Court finds that the totality of the circumstances demonstrate that Travis's statement about the firearm was voluntary.

The Court also determines that Travis was not subject to "interrogation" for the purposes of suppressing the statements. *See McGlothen*, 556 F.3d at 701. Officer Arbuckle asked Travis what was in the baggie retrieved from his pocket and whether it was crack, and Travis stated that that there was a firearm in the car. (Tr. at 19–20). Officer Arbuckle's question was arguably "reasonably likely to elicit an incriminating response" from Travis about drugs. But Travis's statement does not respond to Officer Arbuckle's question, which suggests he was not being interrogated. *See Rhode Island v. Innis*, 446 U.S. 291, 301 (1980) ("[T]he term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the

29

part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police." (footnote omitted)).

The Court has reviewed the video from Officer Arbuckle's squad car. *See* (Gov't's Ex 1). As the Government points out, it is not clear that Travis even heard Officer Arbuckle's question about the crack. *See* (Gov't's Suppl. Mem. at 16). Travis's statement is spontaneous, and not in response to a question. Even if Travis's statement can be considered a response, Officer Arbuckle did not question Travis about firearms. Thus, Travis's statement about the firearm was not in response to interrogation.

Based on the foregoing, the Court concludes the Travis was in custody at the time he made the statement about the firearm. But because Travis made the statement voluntarily, and not in response to an interrogation, the Court recommends that, to the extent the Motions to Suppress Statements seek suppression of Travis's statement about the firearm, the Motions be denied.

### F.    Vehicle Search

Travis asserts the search of his vehicle violated his Fourth Amendment rights because it was not a search incident to arrest because there were no grounds for arrest, because no exception regarding "safety and evidence destruction" were met, and because the search "improperly extended the search and seizure of Travis and his vehicle as there was no 'sack of marijuana' in the vehicle," and Travis's statement about the gun "was derived from improper unmirandized interrogation as he was improperly arrested." (Travis's Suppl. Mem. at 12–13).[22]

---

[22]    Travis does not address the vehicle search in his Reply. *See generally* (Reply).

The Government argues Officer Arbuckle had probable cause to search the vehicle based on two facts: Officer Arbuckle smelled marijuana when he approached the vehicle, and Travis told Officer Arbuckle that there was marijuana in the car. (Gov't's Suppl. Mem. at 14–15).

The automobile exception to the warrant requirement allows police officers to "conduct a warrantless search of a vehicle and containers within the vehicle whenever probable cause exists." *United States v. Sample*, 136 F.3d 562, 564 (8th Cir. 1998) (citing *California v. Acevedo*, 500 U.S. 565, 580 (1991)). Under this exception, police may search a vehicle if they have probable cause to believe that the vehicle contains contraband. *United States v. Payne*, 119 F.3d 637, 642 (8th Cir. 1997) (citing, *inter alia*, *Chambers v. Maroney*, 399 U.S. 42, 51 (1970)). "In such circumstances, the police may search every part of the car and its contents that may conceal the object of the search" or evidence of a crime. *Id.* (citing, *inter alia*, *Acevedo*, 500 U.S. at 573–76); *see United States v. Thompson*, 906 F.2d 1292, 1298 (8th Cir. 1990).

"Probable cause exists when, given the totality of the circumstances, a reasonable person could believe there is a fair probability that contraband or evidence of a crime would be found in a particular place." *United States v. Nolen*, 536 F.3d 834, 839 (8th Cir. 2008) (internal quotation marks omitted). "[T]he odor of an illegal drug can be highly probative in establishing probable cause for a search." *United States v. Caves*, 890 F.2d 87, 90 (8th Cir. 1989) (citing *Johnson v. United States*, 333 U.S. 10, 13 (1948)).

As stated above, Officer Arbuckle had reasonable, articulable suspicion to extend the scope of the traffic stop to investigate whether the vehicle contained contraband. *Bloomfield*, 40 F.3d at 918. The Court finds Officer Arbuckle had probable cause to search the vehicle. The smell of marijuana is "highly probative" to establish probable cause. *Caves*, 890 F.2d at 90 (citation omitted); *see also United States v. Beard*, 708 F.3d 1062, 1066 (8th Cir. 2013)

(concluding that vehicle search was "lawful under the automobile exception" when the trooper "smelled raw marijuana immediately after [the defendant] rolled down his car window"). Additionally, when Officer Arbuckle asked Travis about the smell, Travis stated that there was marijuana in the car, and pointed towards the center console.[23] (Tr. at 16–17). Under the totality of the circumstances, based on Travis's own statement and the smell of marijuana coming from Travis's vehicle, Officer Arbuckle had reason to believe the vehicle contained contraband, and therefore he had probable cause to search the vehicle. *See Nolen*, 536 F.3d at 839.[24]

### G.  Search Warrant at Hotel Room

Travis argues that the results of the search of the hotel room, executed pursuant to the Search Warrant for room 455 of the Comfort Inn, should be suppressed because the hotel room key was the fruit of an illegal search, the odor of marijuana did not constitute probable cause for the search, "[t]he warrant was issued on improperly gained information, including the recovery of the gun on Travis's information[,]" and "it was not objectively reasonable to believe the information asserted was lawfully obtained." (Travis's Suppl. Mem. at 13). In his Reply, Travis argues there was no probable cause to search for drugs based "on the smell of marijuana . . . and discovery of an illegal weapon[,]" and "[w]hatever supported the search as to drugs was derived from an illegal pat[-]down of [Travis]'s person." (Reply at 4–5). The Government argues there was probable cause, and even if there was not, the good-faith exception applies. (Gov't's Suppl. Mem. at 19).

---

[23] The Court addressed the admissibility of this statement above. Because the Court finds it is admissible, it is properly considered a contributing factor to probable cause. *See supra* at 13–18.

[24] Because the Court finds there was probable cause to search the vehicle, it is not necessary for the Court to address Travis's arguments about whether the search was incident to arrest, made for safety or evidentiary reasons, extended the stop, or was based on Travis's un-*Mirandized* statement about the firearm. *See* (Travis's Suppl. Mem. at 12–13).

### 1.      Affidavit

Detective Melser was the affiant for the Search Warrant and recites the facts of the traffic stop. (Search Warrant at 1–2). Officer Arbuckle pulled Travis over based on three violations of state law: the window tint, rearview mirror obstruction, and failure to signal a turn. (Search Warrant at 2).[25] Officer Arbuckle smelled marijuana from the car, and Travis told Officer Arbuckle there was some marijuana in the vehicle, and admitted to smoking marijuana in the car earlier. (*Id.*). Officer Arbuckle asked Travis to exit the vehicle and patted him down for weapons. (*Id.*). During the pat-down, Officer Arbuckle recovered a large baggie from Travis's jeans pocket, which contained "25 individually packaged bags of suspected heroin." (*Id.*). Travis admitted that there was a handgun in the vehicle, which Officer Arbuckle recovered from the vehicle. (*Id.*). The handgun was stolen from a burglary. (*Id.*). Officer Arbuckle also recovered a hotel room key for the Comfort Inn, and determined that Travis was registered in room 455. (*Id.*). Officer Arbuckle arrested Travis for weapons violations and narcotics. (*Id.*). Officer Arbuckle knocked on the room door, but no one answered. (*Id.*). He entered the room to make sure no one was inside, and waited for the warrant. (*Id.*).

### 2.      Legal Standard

In determining if probable cause exists to issue a search warrant, a court considers the information that was before the issuing magistrate judge and affords "great deference to the issuing judge's determination." *United States v. Smith*, 581 F.3d 692, 694 (8th Cir. 2009). Where no evidence outside of the affidavit was submitted to the issuing judge, "only that information which is found within the four corners of the affidavit may be considered in determining the existence of probable cause." *United States v. Solomon*, 432 F.3d 824, 827 (8th Cir. 2005)

---

[25]     The cited page numbers refer to those assigned by CM/ECF in the attachment to the Government's Omnibus Response.

(citations and internal quotation marks omitted). Probable cause exists when the likelihood of finding evidence of a crime in a certain place is fairly probable. *United States v. Chrobak*, 289 F.3d 1043, 1046 (8th Cir. 2002). Moreover, "'[t]he source and credibility of evidence in support of a warrant request is considered in the totality of the circumstances analysis, and a warrant is proper so long as the evidence as a whole creates a reasonable probability that the search will lead to the discovery of evidence.'" *Id.* (quoting *United States v. Horn*, 187 F.3d 781, 786 (8th Cir. 1999)).

### 3.    Analysis

As an initial matter, the Court does not recommend excluding any of the evidence Travis argues was obtained unlawfully, i.e., the firearm recovered from the vehicle, the heroin and keycard recovered from Travis's pocket, and Travis's statement about the firearm. *See supra.* Therefore, nothing in the affidavit will be excluded from the Court's consideration of probable cause.

The Court finds there was probable cause to issue the Search Warrant. Officer Arbuckle smelled marijuana when he approached Travis's vehicle. (Search Warrant at 2). Officer Arbuckle recovered suspected heroin from Travis's person, along with the Comfort Inn hotel keycard. (*Id.*). Officer Arbuckle pulled Travis over as he drove to the Comfort Inn, and Officer Arbuckle confirmed that Travis rented room 455 at the Comfort Inn. (*Id.*). There was probable cause to believe that room 455 of the Comfort Inn contained additional drugs. *See, e.g.*, *United States v. Montgomery*, 527 F.3d 682, 686 (8th Cir. 2008) (finding probable cause that drugs would be found at defendant's residence where defendant was found driving with drugs, his passenger said he was returning home, and defendant admitted to using and recently purchasing drugs).

Because the Court finds the search warrant was supported by sufficient probable cause, the Court does not conduct a separate analysis on whether the good-faith exception applies. *See United States v. Leon,* 468 U.S. 897, 922–23 (1984).[26] The Court recommends that the Motions to Suppress Physical Evidence be denied to the extent they seek suppression of the evidence seized pursuant to the search warrant executed in room 455 at the Comfort Inn.

**H.      Statements in Jail**

Travis challenges the admissibility of two sets of statements he made in jail. (Travis's Suppl. Mem. at 15–16). One set of statements was made before Travis received a *Miranda* warning. (*Id.*). The Government represents that it "does not intend to elicit at trial statements that [Travis] made to Detective Melser before the advisement of *Miranda* rights." (Gov't's Suppl. Mem. at 16–17). These statements "cover all interactions between [Travis] and Detective Melser on Gov't Ex. 2 from time stamp 02:56–08:25." (*Id.* at 17 n.11). Therefore, to the extent Travis seeks to suppress statements made in jail before the *Miranda* warning, the Court recommends denying that part of his motion as moot.

Next, the Court considers the admissibility of Travis's statements after the *Miranda* warning. (Travis's Suppl. Mem. at 16). Travis argues that he was subject to the type of two-step interrogation described by the Eighth Circuit in *Ollie*. (*Id.* at 16–17) (citing *United States v. Ollie*, 442 F.3d 1135 (8th Cir. 2006)). The Government does not address *Ollie* specifically, but argues the statements were made after a knowing and voluntary waiver, and "nothing in the

---

[26]      Travis does not separately challenge that "freezing" the hotel room was a violation of the Fourth Amendment. *See generally* (Travis's Suppl. Mem.). Instead, Travis states that because the keycard was obtained "[a]s fruit of an illegal pat-down, officers could not rely on using the key to freeze the room." (*Id.* at 13). The Court does not construe this as an alleged Fourth Amendment violation, and therefore need not address whether freezing the room was appropriate. *See* (Gov't's Suppl. Mem. at 20–21).

record suggests that Detective Melser used a staged interrogation process as a stratagem." (Gov't's Suppl. Mem. at 17).

### 1.    Legal Standard

In *Ollie*, the Eight Circuit addressed the Supreme Court's decision in *Missouri v. Seibert*, 542 U.S. 600 (2004). 442 F.3d at 1141–42. In *Seibert*, the Court considered whether a second, repeated statement made after waiving rights under *Miranda* is admissible when the first statement was taken in violation of *Miranda* and produced a confession. 542 U.S. at 604. (plurality opinion). The Court held that "a statement repeated after a warning in such circumstances inadmissible." *Id.* The plurality suggested several facts that must be considered regarding whether a midstream *Miranda* warning was effective. *Id.* at 615. Justice Kennedy concurred in the judgment, but did so on narrower grounds. *Ollie*, 442 F.3d at 1141–42. Justice Kennedy held that statements made after a *Miranda* warning should be suppressed "only where the police intentionally used the two-step interrogation technique to render *Miranda* warnings ineffective. Such statements would be inadmissible unless the police took curative measures that would ensure that a reasonable person would understand his or her rights." *Id.* at 1142 (citing *Seibert*, 542 U.S. at 621–22 (Kennedy, J., concurring)). The Eighth Circuit found that Justice Kennedy's concurrence was controlling. *Id.* It also held that when a defendant moves to suppress this type of statement, i.e. a statement made after a *Miranda* warning but made after an earlier, unwarned statement, the government "must prove, by a preponderance of the evidence, that the officer's failure to provide warnings at the outset of questioning was not part of a deliberate attempt to circumvent *Miranda*." *Id.* at 1142–43.

### 2.      Additional Facts

Government's Exhibit 2 is a recording of Travis's interrogation in the Bloomington jail. (Tr. at 37); (Gov't's Ex. 2). The recording begins with Detective Melser identifying himself, the case, and Travis, and Travis is apparently not in the room yet. (Gov't's Ex. 2 at 00:05–00:26). The interview begins about two minutes later when Travis enters the room. (*Id.* at 2:56); (Tr. 58). Detective Melser initially asks Travis if he got any sleep, and Travis expresses an interest in moving to the "next phase" of the case. (Gov't's Ex. 2 at 2:56–3:05).[27] Detective Melser says they have "some things to talk about" and that he wants to tell him some things that happened after Travis was arrested. (*Id.* at 3:21–3:35). Detective Melser then obtains some information from Travis about his name, address, who he lives with, and cell phone numbers. (*Id.* at 3:36–4:54). He asks Travis if he knows why he is in jail, and Travis says he messed up. (*Id.* at 4:55–5:08). Detective Melser says he will be "straight" with Travis and tells him that "it ain't good for [him]," and asks him if he has "some history." (*Id.* at 5:10–5:19). Detective Melser says "before we even get started on the stuff yesterday," he has some stuff for him "to think about" and asks how much time Travis has done for guns in the past. (*Id.* at 5:20–5:47). Detective Melser again says "it ain't going to be good," and that an ATF agent is "interested in charging [Travis] federally." (*Id.* at 5:48–58). Detective Melser says that whether that happens depends on "how [their] interview goes." (*Id.* at 5:59–6:08). He further states he cannot make any promises but can make recommendations. (*Id.* at 6:09–14). According to Detective Melser, being charged in state court instead of federal could be the difference of Travis "doing five years versus twenty." (*Id.* at 6:16–27). Detective Melser characterizes this as "food for thought." (*Id.* at 6:27–34). He then says "before we start," he wants to talk to Travis about yesterday and tells Travis his girlfriend

---

[27]      The Government has not provided a transcript of the recording and therefore, all quotes are the Court's transcription of the recordings.

was arrested, and that police officers executed a search warrant at the hotel room and "dope" was found. (*Id.* at 6:35–7:00). Travis says his girlfriend had nothing to with "it," and Detective Melser says "that's what I'm here to talk to you about." (*Id.* at 7:00–08). Detective Melser repeats that Travis's girlfriend is "here right now" (i.e., in jail), and says "if you're saying . . ." before being interrupted by Travis saying his girlfriend had nothing to do with "it" and making inculpatory statements. (*Id.* at 7:09–26). Detective Melser says that "they only had what was on [Travis] at the time," and they "did a warrant afterwards," and Detective Melser is talking to Travis to "clarify everything." (*Id.* at 7:27–8:02). Travis again says his girlfriend had nothing to with "it," and expresses concern about his girlfriend losing her job. (*Id.* 8:03–8:23). Detective Melser says they will "get through it" so that she can leave. (*Id.*).

Finally, Detective Melser reads Travis his *Miranda* rights, which Travis states that he understands. (*Id.* at 8:24–43). Detective Melser asks Travis if he is willing waive his rights, and says "now is the time we have to straighten it out." (*Id.* at 8:44–9:04).[28] Travis again expresses concern about his girlfriend, and Detective Melser explains that she had stuff in the hotel room. Detective Melser asks Travis a second time if Travis is willing to talk to him, and Travis says "sure." (*Id.* at 9:05–9:33); (Tr. at 59). Detective Melser says, "so you're saying that everything that was in the room. . . ." and Travis interrupts him and makes further inculpatory statements. (Gov't's Ex. 2 at 9:33–52). The interview continues, but Travis does not separately challenge or address any statements made after this point. *See generally* (Travis's Suppl. Mem.); (Reply). Further, the Court does not find any further inquiry into subsequent parts of the interview necessary to resolve the instant issue.

---

[28]    There is some time between 8:44 and 9:04 on the recording when neither Travis nor Detective Melser is talking, and there are some sounds that suggest they are shuffling or signing papers. (Gov't's Ex. 2 at 8:44–9:04).

### 3.    Analysis

The Court finds that the Government failed to meet its burden to prove, by a preponderance of the evidence, that Detective Melser's failure to issue a *Miranda* warning at the beginning of the interview "was not part of a deliberate attempt to circumvent *Miranda*." *See Ollie*, 442 F.3d at 1143.

Other cases from this District are instructive. In *United States v. Gross*, police officers removed the defendant from his residence in connection with executing a search warrant, placed him in a police minivan, and asked him questions without a *Miranda* warning. Criminal No. 08-254 (MJD/JJK), 2009 WL 430503, at *2–3 (D. Minn. Feb. 20, 2009). Then police took the defendant back into his residence, read him his *Miranda* rights, and questioned him again at his residence, and for a third time at the police station. *Id.* at *3–4. The Honorable Jeffrey J. Keyes, United States Magistrate Judge, found this was not the same as a situation "where an officer may not realize that a suspect is in custody and warnings are required or where a defendant blurts out an incriminating statement unexpectedly before *Miranda* warnings are given."[29] *Id.* at *9. The Government offered no reason why the first discussion took place in the minivan, and Magistrate Judge Keyes found "it is reasonable to infer that the purpose of this technique was to create an intimidating setting and make it more likely that [the d]efendant would not exercise his right to remain silent . . . ." *Id.* The Government also offered no testimony that the absence of a *Miranda* warning was an innocent mistake. *Id.* at *10. Magistrate Judge Keyes went on to say

> It is important to apply the exclusionary rule to suppress the post-*Miranda* statements in cases like this because otherwise there is too great a risk that savvy police officers would often fall back on using a separate, pre-warning, warm-up interrogation that uses intimidation to overcome the protection of *Miranda*. If this

---

[29]    The Honorable David S. Doty adopted Magistrate Judge Keyes's Report and Recommendation over both parties' objections. *Gross*, 2009 WL 430503.

option existed, officers could employ the question-first technique with impunity by simply claiming that a failure to provide warnings was an oversight.

*Id.* at *10 (citation and internal quotation marks omitted).

In *United States v. Sims*, the Honorable Janie S. Mayeron, United States Magistrate Judge, found a defendant's *Mirandized* statements should be suppressed because "the Government . . . failed to meet its burden of demonstrating that [the first police officer's] failure to read [the defendant] his *Miranda* warnings prior to questioning him was not deliberate."[30] Criminal No. 13-109 (DSD/JSM), 2013 WL 4199146, at *7 (D. Minn. Aug. 15, 2013). Magistrate Judge Mayeron noted that at the time of the first, unwarned questioning, the defendant "was clearly a suspect," the first police officer "did not cite any exigent circumstances to justify his failure to read the warning[,]" neither the first nor second police officer attempted to cure the error, the interrogations had similar questions, and the second interrogation referred to the first one. *Id.*

Here, there is no question that Travis was already in custody when his conversation with Detective Melser began. (Tr. at 57). This means that there was no reason to believe that a *Miranda* warning was not required. *Cf. Gross*, 2009 WL 430503, at *9. The Government has offered no reason regarding why a *Miranda* warning was not provided, nor did it contend that failing to do so was merely a mistake. *See id.* at *10; *see also United States v. Ladoucer*, Crim. No. 07-165(1) (ADM/JSM), 2007 WL 3051434, at *5 (D. Minn. Oct. 17, 2007) (finding that even though the police officer testified that he forgot to give the defendant a *Miranda* warning during the first interrogation, there were "no unusual, hurried, or exigent circumstances" that

---

[30]     Magistrate Judge Mayeron's Report and Recommendation was not objected to by either party, and was adopted by Judge Doty. *Sims*, 2013 WL 4199146.

might have caused the police officer to forget, and the police officer "did not take any curative measures after he realized he failed to provide *Miranda* warnings.").

The Government argues that "nothing in the record" suggests that Detective Melser was attempting to circumvent *Miranda* requirements, but the Court finds the recording demonstrates otherwise. *See* (Gov't's Suppl. Mem. at 17). First, Detective Melser tells Travis things are not looking good for him two times. (Gov't's Ex. 2 at 5:10–19; 5:48–58). He also tells Travis he has some things for Travis to "think about" and asks how much time Travis has served in the past for gun offenses. (*Id.* at 5:20–47). Detective Melser tells Travis that an ATF agent wants to bring charges and whether that happens depends on how the interview goes. (*Id.* at 5:59–6:08). Detective Melser goes on to say that he cannot make promises but can make recommendations. (*Id.* at 6:09–14). These pre-*Miranda* warning statements appear to be designed to encourage Travis to speak with Detective Melser. As Travis points out, Detective Melser's statements about Travis's girlfriend, who Travis is obviously concerned about, may be an attempt to elicit inculpatory statements in an effort to protect his girlfriend. (Travis's Suppl. Mem. at 16). These facts show that Detective Melser was attempting to get information from Travis or, at the very least, encourage him to cooperate by speaking to Detective Melser.

The Government offers no reasons for why Detective Melser failed to administer *Miranda* at the beginning of the interview. *See* (Gov't's Suppl. Mem. at 17–18); *see Sims*, 2013 WL 4199146, at *7; *Gross*, 2009 WL 430503, at *10. Further, the Government elicited no testimony that explained why no *Miranda* warning was given, and Detective Melser admitted that he could have waited until after providing Travis with the *Miranda* warning to discuss the

substantive matters about the investigation. (Tr. at 55–62, 64);[31] *see Sims*, 2013 WL 4199146, at

*7; *Gross*, 2009 WL 430503, at *10.

The Court finds that the post-*Miranda* statements were part of a two-step interrogation

that *Seibert* and *Ollie* prohibit. As noted by the Supreme Court, a midstream *Miranda* warning

raises the concern of whether such a warning could "reasonably convey that [the defendant]

could choose to stop talking even if he had talked earlier[.]" *Seibert*, 542 U.S. at 612 (plurality

opinion). Neither Detective Melser nor the Government provides any justification regarding why

Detective Melser began speaking with Travis, who was already in custody, prior to giving him

his *Miranda* rights. Additionally, nothing in the record points to any attempt to cure the initial

failure to provide a *Miranda* warning. *See id.* at 622 (Kennedy, J., concurring) (describing

potential curative measures). Thus, nothing in Detective Melser's *Miranda* warning effectively

conveyed Travis's rights to him, specifically, that he could choose to stop talking, even though

he had talked earlier. *See id.* at 612 (plurality opinion). For the foregoing reasons, the Court

recommends that Travis's post-*Miranda* statements be suppressed.[32]

---

[31]     On cross-examination, Travis's counsel asked Detective Melser several questions relating
to the *Miranda* warning, and Detective Melser essentially said he was giving Travis information
but was not attempting to elicit a response from him. *See* (Tr. at 63–64). Detective Melser denied
that the statements before the *Miranda* warning were designed to assist Detective Melser in
charging Travis or to assist Detective Melser in obtaining Travis's consent to talk to him. (*Id.*).
The Court finds Detective Melser was not credible in this respect. Detective Melser testified that
typically, a person is not *Mirandized* when they are arrested; instead they are *Mirandized* the
next day. (*Id.* at 65).

[32]     Because the Court finds Travis's post-*Miranda* statements must be suppressed based on
the interview at the Bloomington jail, it is not necessary for the Court to separately address
whether statements made during the traffic stop have an impact on the admissibility of the post-
*Miranda* statements. *See* (Travis's Suppl. Mem. at 16) (arguing that statements made during the
traffic stop "compound[] [Detective] Melser's improper interrogation."); *see also* (Reply at 5).

Additionally, the Government argues Travis's post-*Miranda* statements were not coerced.
*See* (Gov't's Suppl. Mem. at 17–18). Voluntariness is an important consideration in determining
whether suppressed statements may be admitted for impeachment purposes if Travis testifies at
trial. *See Harris v. New York*, 401 U.S. 222, 226 (1971); *see also United States v. Garreau*, 735

**IV.     RECOMMENDATION**

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1.      Defendant's Motion to Suppress Evidence Obtained by Seizure [Doc. No. 20] be **DENIED as moot** based on the Government's representation that this type of evidence, evidence from Travis's cell, does not exist;

2.      Defendant's Motion for Suppression of Electronic Surveillance Wiretapping Evidence [Doc. No. 24] be **DENIED as moot** based on the Government's representation that this type of evidence does not exist;

3.      Defendant's Motions to Suppress Physical Evidence [Doc. Nos. 22, 37] be **DENIED**; and

4.      Defendant's Motions to Suppress Statements [Doc. Nos. 23, 38] be **GRANTED** in part and **DENIED in part** as follows:

   a.      To the extent Defendant seeks suppression of his statements made at the Bloomington jail before receiving a *Miranda* warning, the Motions are **DENIED as moot** based on the Government's representation that it does not intend to introduce these statements at trial;

   b.      To the extent Defendant seeks suppression of his statements made at the Bloomington jail after receiving a *Miranda* warning, the Motions are **GRANTED**; and

---

F. Supp. 2d 1155, 1167–68 (D.S.D. 2010) (suppressing statements during the government's case-in-chief because they were made in violation of *Miranda* but permitting the statements to be used for impeachment purposes). But because Travis does not allege that the statements were involuntary and it is not relevant to whether the statements can be admitted as evidence under the two-step interrogation process prohibited by *Seibert* and *Ollie*, the Court does not address it.

        c.        The Motions are **DENIED** in all other respects.

Dated: January 9, 2015

*s/Steven E. Rau*
Steven E. Rau
United States Magistrate Judge

Under D. Minn. LR 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court and serving all parties by **January 23, 2015**, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections. Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals. This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable to the Court of Appeals.